476 So.2d 729 (1985)
Russell TUCKER, Appellant,
v.
AGRICO CHEMICAL COMPANY & Underwriters Adjusting Co., Appellees.
No. AZ-295.
District Court of Appeal of Florida, First District.
September 27, 1985.
Rehearing Denied November 1, 1985.
*730 O. John Alpizar, Palm Bay, Bill McCabe of Shepherd, McCabe & Cooley, Orlando, for appellant.
Charles E. Bentley of Holland & Knight, Lakeland, for appellees.
WENTWORTH, Judge.
This appeal controverts a deputy commissioner's order of April 23, 1984, denying modification of an order of June 2, 1980. The 1980 order awarded permanent partial disability compensation in the amount of claimant's 25% anatomical rating attributable to a 1977 accident and two ensuing back surgeries. We reverse because the deputy's conclusion, i.e., that claimant had suffered no change in his compensable physical impairment, is not supported by the evidence referenced in his order or by the parties on appeal, and because the order reflects an apparent misapplication of the standards governing determination of change of condition under § 440.28, Florida Statutes.
The appellant claimant hurt his back in a February 1977 accident in his employment as a diesel mechanic. He had surgery in March 1977 for removal of a herniated nucleus pulposis, L5S1 left. He returned to work with limitations and in January 1978 first came under the care of Dr. Taxdal, who did further surgery for excision of herniated nucleus pulposis, L3-4 and L4-5, left. Maximum medical improvement was fixed on April 25, 1978, in a report returning claimant to light duty with a cumulative rating of 25% impairment, stating in part, "I can gain all reflexes.... The limitation will be lifting up to 40 pounds... . should light duty cause aggravation, we will, of course, make the appropriate recommendation to vocational rehabilitation." Palliative care continued and claimant attempted to return to work at lighter duty jobs for his original employer but was unable to continue. Compensation was voluntarily paid for 10% permanent partial disability.
The order of June 2, 1980, which was not appealed, reclassified the compensation paid and awarded compensation on the basis *731 of a 25% permanent impairment. The order found that claimant's election to move to his original home in Ohio where he had family "is not unreasonable under the circumstances of this claim;" that "it was reasonable that the claimant did not return to work for the Employer" because his customary job was medically prohibited; but as to job search generally, "I am not convinced that his search was in earnest." Claimant continued under medical care in Ohio for post-laminectomy syndrome and, upon evaluation there by a carrier-appointed orthopedic surgeon, carrier commenced permanent total disability payments in June 1983. In February 1984 claimant was, by order of the deputy, compelled to return to Dr. Taxdal for examination, after which carrier terminated payments and filed a notice to controvert. Hearing was then held on claimant's petition for modification of the former order based on both physical and economic change of condition.
The deputy's current order found the claimant failed to prove a change in condition, based "primarily on the testimony of Dr. David R. Taxdal," again rating claimant's impairment at 25%, because he "is in the best possible position to evaluate Claimant's condition before and after the Order of June 2, 1980," and "was the only physician to testify live before me." While the deputy's election to rely on one doctor in conflict with all other medical testimony before him[1] would ordinarily be within his prerogatives, his reliance must of course be warranted by the substance of that medical testimony, and not merely by the doctor's conclusion against an increased rating nor his singular status as a live witness who saw claimant before and after the prior order.[2] This follows from the unique and nondelegable nature of the obligation of the deputy, and not the medical witness, to determine the existence or absence of change in a condition determined by a prior order.
Our task has, accordingly, been to examine all of the pertinent content in Dr. Taxdal's testimony before the deputy.[3] Our conclusion is that even this witness' testimony supports in substance a finding of material change in claimant's condition over the years in question, and requires remand to the deputy to determine the benefits due, if any. For example, Dr. Taxdal stated unequivocally that he could not gain all reflexes[4] in his 1984 examination of claimant's lower extremity, contrary to the same data in his report before the earlier order. That order also recited, "Dr. Taxdal has permitted the Claimant to lift up to forty pounds," while his testimony in the transcript before us is, "I would limit his lifting to 30 pounds, bending at the knee."[5] Numerous other indications of deterioration in claimant's physical capacity were discounted by Dr. Taxdal on the basis of subjectivity.[6]
*732 With all due deference for the deputy's apparent determination against the credibility of many of claimant's complaints,[7] we find that other record evidence in aggregate compels a conclusion that claimant suffered a change in physical condition sufficient to require the issuance of a new compensation order based on present conditions.
With respect to claimant's second point on appeal, controverting the determination against proof of increased economic loss, we find the deputy erred in relying primarily on lack (or unpersuasiveness) of job search evidence for the time preceding and during the period when carrier granted claimant permanent total disability status and paid compensation accordingly. That issue should be determined anew in the light of that fact upon remand, based on the existing record together with any new evidence which may be particularly appropriate[8] for the period after carrier's notice to controvert apprised claimant of his burden of proof. We do not address all evidentiary points argued by claimant[9] because we assume the new order will fairly reappraise and correlate all pertinent evidence.
Reversed and remanded for further proceedings consistent herewith.
NIMMONS and ZEHMER, JJ., concur.
NOTES
[1] All other depositions and medical reports in evidence, from doctors who treated or examined claimant between 1979 and the date of hearing in 1984, appear to us to be uniform in assessing a progressive deterioration of conditions related to his injury and a current impairment rating by AMA standards at approximately 50% or higher. They included numerous new limitations such as a 5 pound lifting limit.
[2] Geiger Distributors, Inc. v. Snow, 186 So.2d 507 (Fla. 1966).
[3] Both parties' briefs have served to aid this function in a commendable fashion, but the order before us contains no specifics other than a reference to Dr. Taxdal's February 1984 EMG as "within normal limits," which had also been the EMG finding immediately preceding Dr. Taxdal's disc surgery, which was claimant's second such procedure.
[4] Reflex movement is defined generally as involuntary activity: Dorland's Illus. Medical Dictionary, 25th Ed., p. 1335.
[5] We note the deputy's apparent misapprehension of the legal effect of this change:

The Commissioner: ... on Dr. Taxdal's 4/25/78 report it was 40 pounds ... So if he said 30 here that would be somewhat of an improvement, wouldn't it? ... That's better, isn't it? From 40 to 30?
[6] He testified:

A. From a physical viewpoint, there's no reason he can't sit. The only reason he can't sit is some objective reason that he tells us.
Q. You mean subjective?
A. Thank you, subjective. He does. The man says, I hurt. I can't sit. I have got to get up and walk around. We don't take issue with that. That would have to be worked out and determined by those who are expert in that field.
The doctor's testimony did not, however, show that he discounted subjectivity in his own methodology, i.e., the absence of x-rays to determine presence or absence of osteo-arthritic conditions at the time of his original surgery and sequalae, and the absence of any measurement of muscle size in assessing atrophy:
Q. Doctor, as part of your evaluation in February of 1984, did you measure the circumference of either the thigh or the calf?
A. No.
Q. Isn't that a  typically the way that you determine whether there is atrophy present in any of those muscles?
A. I use a visual inspection. I find that every time I have three different examiners, they give me three different numbers.
[7] The order recites, "I am not persuaded that the extent of Claimant's demonstrated disability comports with his expressions of pain and limitation."
[8] Cf. Flesche v. Interstate Warehouse, 411 So.2d 919 (Fla. 1st DCA 1982).
[9] E.g., a consideration of the claim for permanent total disability benefits may require some disposition of the question of vocational rehabilitation (proposed by Dr. Taxdal) or a specific finding that claimant rejected such offer.